**GOTHAM PARTNERS, L.P., Plaintiff Below, Appellant,**

v.

**HALLWOOD REALTY PARTNERS, L.P., Hallwood Realty Corporation, the Hallwood Group Incorporated, Anthony J. Gumbiner and William L. Guzzetti, Defendants Below, Appellees/Cross–Appellants.**

**No. 372, 2001.**

Supreme Court of Delaware.

Submitted: March 26, 2002.
Decided: Aug. 29, 2002.
Revised: Oct. 11, 2002 *.

\* The August 29, 2002 opinion has been revised to delete the paragraph that began on page 10 and ended on page 11, including the deletion of footnotes 15, 16 and 17. This revision eliminates a factual misstatement regarding the legislative history of DRULPA and does not affect the outcome of the appeal or the Court's rationale.

Edward M. McNally, of Morris, James, Hitchens & Williams LLP, Wilmington, DE; Philip H. Schaeffer (argued), Dwight A. Healy, Karen M. Asner, and David G. Hille, of White & Case, LLP, New York City; and Theodore N. Mirvis, and Jed I. Bergman, of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for Appellant.

Michael D. Goldman (argued), Stephen C. Norman, and Matthew E. Fischer, of Potter Anderson & Corroon, LLP, for Appellees/Cross–Appellants.

Before VEASEY, Chief Justice, WALSH, HOLLAND, and BERGER, Justices, and HARTNETT, Justice (Retired),** constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal, we hold that a limited partnership agreement may provide for contractually created fiduciary

---

** Sitting by designation pursuant to Del. Const. art. IV, § 38 and 29 *Del. C.* § 5610.

duties substantially mirroring traditional fiduciary duties that apply in the corporation law. The Court of Chancery held that the limited partnership agreement here provided for such fiduciary duties by requiring the general partner and its controlling entity to treat the limited partners in accordance with the entire fairness standard. We agree with this holding and also agree with the trial court that the defendants are jointly and severally liable because the challenged transaction breached the entire fairness provisions of the partnership agreement.

■ With respect to remedies for that breach, the plaintiff limited partner had demanded rescission or an adequate damage award and sterilization of the voting rights attached to the partnership units involved in the challenged transaction. The Court of Chancery refused to order rescission and awarded damages. We affirm the holding of the Vice Chancellor that he was not necessarily required to order rescission by the limited partnership contract or the application of equitable principles. Such a decision is properly within the discretion of a court of equity, but here the Court of Chancery did not fashion a remedy that is an appropriate substitute for rescission under the circumstances.

As the Court of Chancery noted, one effect of the challenged transaction was that the general partner and its corporate parent gained control of the limited partnership as a result of wrongdoing. In our view, the value of the control thus achieved was not properly compensated for by the award of damages because the trial court did not account properly for a control premium in its remedy calculation.

Consequently, we reverse the damages award and remand for such proceedings as may be necessary and appropriate: (1) to quantify how the challenged transaction would have been consummated had the defendants adhered to the entire fairness standards and procedures of the limited partnership agreement; and (2) to consider and award one or more of the various equitable remedies available to the limited partnership, including rescission, rescissory damages, sterilization of voting rights, or other appropriate methods of accounting for the control premium.

### Facts

Hallwood Realty Partners, L.P. ("the Partnership") is a Delaware limited partnership that owns commercial office buildings and industrial parks in several locations in the United States and lists its partnership units on the American Stock Exchange. Gotham Partners, L.P. ("Gotham") is a hedge fund, the investments of which include real estate. It is the largest independent limited partner in the Partnership with approximately 14.8 percent of the outstanding partnership units. Hallwood Realty Corporation ("the General Partner") is the sole general partner and is a wholly-owned subsidiary of Hallwood Group Incorporated ("HGI"), which owned 5.1 percent of the outstanding partnership units before the transactions challenged in this case. Anthony Gumbiner and William Guzzetti were members of the board of directors of the General Partner. They were also officers of HGI at the time of the challenged transaction.[1]

In 1994, the Partnership's units were trading at a low price because of the ongo-

---

**1.** Gumbiner, a corporate lawyer, owned 30 percent of HGI's shares between 1994 and 1995 and was the chairman of the board of directors and chief executive officer of the General Partner at the time of the challenged transactions. Guzzetti, a former lawyer, is an executive vice-president of HGI and was the president of the Partnership and a member of the General Partner's board of directors at the time of the challenged transactions.

ing economic recession in real estate. On October 12, 1994, Guzzetti proposed to the Partnership's board of directors that it approve a reverse split,[2] a unit option plan,[3] and an odd lot tender offer[4] subject to HGI's willingness to finance the transactions by buying any fractional units generated by a reverse split and any units purchased by the Partnership in an odd lot tender offer. At the time, more than half of the Partnership's units were held in odd lots and could be resold to HGI. Guzzetti told the board that HGI was the only source of financing available and that the transactions would, among other things, raise the trading price of the Partnership's units, reduce the Partnership's administrative costs, and give odd lot holders the chance to sell at market price without incurring brokerage fees. The Partnership's board approved the transactions, citing Guzzetti's reasons.

At first, HGI declined to provide funding for the reverse split and odd lot offer. But, by March 1995, HGI was willing to fund the Reverse Split and Option Plan, which were approved by the non-HGI directors on the General Partner's board. HGI purchased 30,000 units, approximately 1.6 percent of the Partnership's equity, through the Reverse Split. The Option Plan resulted in officers and employees of the General Partner purchasing 86,000 units or 4.7 percent of the Partnership's equity. Through these two transactions,

HGI increased its ownership of outstanding Partnership units from 5.1 percent to approximately 11.4 percent.

By May 1995, HGI was willing to fund an odd lot tender offer. Guzzetti called a special meeting of the General Partner's board of directors after circulating a memorandum indicating that 55 percent of the Partnership's units were held in odd lots and thus could be tendered in the odd lot offer. The non-HGI directors voted as a "special committee" to approve the Odd Lot Offer. The purchase price of an odd lot was putatively set at the five-day market average referenced in Section 9.01(b) of the Partnership Agreement.[5] No valuation information was shared with the board.

The Odd Lot Offer began on June 5, 1995. The accompanying press release indicated that the Partnership would resell any tendered odd lot units to HGI, affiliates of HGI, or other institutional investors. The Odd Lot Offer and Resale was pitched to the public and the American Stock Exchange as a resale to HGI of existing, listed Partnership units, not as an issuance of new, unlisted units. Consequently, the Partnership never filed a listing application with the American Stock Exchange for the units sold to HGI, and the Partnership's accounting books did not treat the Odd Lot Resale to HGI as an issuance of units.

2. A reverse split reduces the number of outstanding units and consequently increases the per unit value of each unit. Reverse splits usually create odd lots.

3. In this case, the option plan would sell post-reverse split units to officers and employees of the General Partner, including Gumbiner and Guzzetti.

4. An odd lot offer is a tender offer by the issuer for blocks of fewer than one hundred outstanding units or shares. Such "odd lots" are considered small and thus create inefficient administrative costs for issuers and may

be difficult to sell at an attractive price. Odd lot offers are designed to provide liquidity to small holders and to reduce issuer costs.

5. Section 9.01(b) of the Partnership Agreement states: "Except as set forth above, the number of Units issued to the General Partners or any such Affiliate in exchange for any Capital Contribution shall not exceed the Net Agreed Value of the contributed property or amount of cash, as the case may be, divided by the Unit Price of a Unit as of the day of such issuance."

From June 9 to July 25, 1995, when the Odd Lot Offer closed, the Partnership purchased 293,539 units from odd lot holders and placed them in a holding account. The Partnership then resold the units to HGI at the same price the Partnership paid for them, approximately $4.1 million. The Odd Lot Resale resulted in HGI purchasing approximately 23.4 percent of the Partnership's outstanding units. Thus, HGI increased its stake in the outstanding Partnership units from 11.4 percent to 29.7 percent and solidified its control over the Partnership. The Partnership Agreement requires the written consent or affirmative vote by at least 66 and 1/3 percent of the limited partners to remove a general partner.[6]

Gotham began purchasing Partnership units in 1994 and owned 14.8 percent of the outstanding units as of September 1996. Gotham was aware of the Odd Lot Offer and Resale but did not complain to the Partnership until January 1997 when it requested access to the Partnership's books and records. The Partnership denied the request.

### Preliminary Proceedings in the Court of Chancery

Gotham filed a books and records action in the Court of Chancery in February 1997. On June 20, 1997, Gotham filed another action in the Court of Chancery alleging derivative claims in connection with the Odd Lot Offer and Resale, the Reverse Split, and the Option Plan. Gotham alleged that these transactions were unfair to the Partnership's unitholders because HGI paid an unfairly low price to acquire control over the Partnership. Gotham's claims included breaches by the General Partner of traditional fiduciary duties and contractually based fiduciary duties. The claims also charged Gumbiner and Guzzetti, the General Partner's HGI-affiliated directors, and HGI itself with aiding and abetting those breaches. Gotham and the Partnership negotiated a settlement of the books and records action but the derivative action continued.

On summary judgment, the Court of Chancery sustained the contractual fiduciary duty claims and dismissed the traditional fiduciary duty claims on the ground that the Partnership Agreement supplanted traditional fiduciary duties and provided for contractual fiduciary duties by which the defendants' conduct would be measured.[7] The Vice Chancellor found that Sections 7.05[8] and 7.10(a)[9] of the Partnership Agreement operate together as a contractual statement of the entire fairness standard, with Section 7.05 substantively requiring fair price and Section

---

**6.** Section 14.09(a) of the Partnership Agreement states in relevant part: "The General Partner may be removed as General Partner, with or without cause, only upon the written consent or affirmative vote of Record Holders who are, or are nominees for, Limited Partners owning at least 66–1/3% of the Outstanding Units."

**7.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P. ("Gotham S.J. Op.")*, Del. Ch., C.A. No. 15754, 2000 WL 1476663 (Sept. 27, 2000), at 23–29.

**8.** Section 7.05 of the Partnership Agreement states: *"Transactions with General Partner or Affiliates.* The Partnership is expressly permitted to enter into transactions with the General Partner or any Affiliate thereof provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party."

**9.** Section 7.10(a) of the Partnership Agreement states in relevant part: *"Audit Committee; Resolution of Conflicts of Interest.* (a) The General Partner shall form an Audit Committee (the "Audit Committee") to be comprised of two members of the board of directors of the General Partner who are not affiliated with the General Partner or its Affiliates except by reason of such directorship. The

7.10(a) substantively requiring fair dealing.[10] No appeal has been taken from this ruling.

The Vice Chancellor's summary judgment opinion in this case, however, creates a separate problem. We refer to one aspect of the Vice Chancellor's discussion of the Delaware Revised Uniform Limited Partnership Act ("DRULPA") in his summary judgment opinion in this case where he stated that section 17–1101(d)(2) "expressly authorizes the *elimination,* modification or enhancement of . . . fiduciary duties in the written agreement governing the limited partnership." [11] It is at least the second time the Court of Chancery has stated in dicta that DRULPA at 6 *Del. C.* § 17–1101(d)(2) permits a limited partnership agreement to *eliminate* fiduciary duties.[12]

Because the Vice Chancellor's summary judgment order in this matter has not been appealed, his opinion on this point is not before us for review on this appeal. In our view, however, this dictum should not be ignored because it could be misinterpreted in future cases as a correct rule of law.[13] Accordingly, in the interest of avoiding the perpetuation of a questionable statutory interpretation that could be relied upon adversely by courts, commentators and practitioners in the future, we are constrained to draw attention to the statutory language and the underlying general principle in our jurisprudence that scrupulous adherence to fiduciary duties is normally expected.

Section 17–1101(d)(2) states: "the partner's or other person's duties and liabilities

functions of the Audit Committee shall be to review and approve . . . (ii) transactions between the Partnership and the General Partner and any of its Affiliates."

10. *Gotham S.J. Op.,* at 28, 2000 WL 1476663 at *11.

11. *Id.* at 24, 2000 WL 1476663 at *10 (emphasis added).

12. *Id. See also Sonet v. Timber Co.,* 722 A.2d 319, 323 (Del.Ch.1998) (stating that § 17–1101(d) "apparently [allows] broad license to enhance, reform, or *even eliminate* fiduciary duty protections . . .") (emphasis added).

13. Commentators have already noted some uncertainty on this subject. *See, e.g.,* Martin I. Lubaroff and Paul M. Altman ("Lubaroff & Altman"), *Delaware Limited Partnerships* § 13.1.2 at 13–2 (2002 Supp.) § 11.2.6 at 11–26.8 to 11–26.9:

Although on its face Section 17–1101(d) permits the fiduciary duty of a general partner to be expanded or restricted without limit by the terms of a partnership agreement, it is not clear whether a restriction can be such as to totally eliminate all fiduciary duties. The issue of the extent to which a fiduciary duty may be restricted

has not yet been resolved. The question has been left to the courts to determine as the area develops. . . . In *Sonet I,* however, the Court of Chancery did note, in passing, that Section 17–1101(d) "apparently [allows] broad license to enhance, reform, or even eliminate fiduciary duty protections. . . ." 722 A.2d at 323. . . . Nevertheless, given the contractual nature of a partnership agreement and the relationship among partners, and the Act's provisions and recognition of the principle of freedom of contract, at a minimum, a very substantial and material limitation and restriction on the duties of a general partner, including a general partner's fiduciary duties, should be permitted and enforced.

\* \* \*

In *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* C.A. No. 15754, 2000 WL 1476663 (Del.Ch. Sept. 27, 2000) (memo opinion), the Court again examined contractual modification of fiduciary duties.

\* \* \*

In its discussion of Section 17–1101(d)(2), the Court stated that such section "expressly authorizes the *elimination,* modification, or enhancement of . . . fiduciary duties in the written agreement governing the limited partnership." *Id.* at 24, 2000 WL 1476663 at *10 (emphasis added).

may be *expanded* or *restricted* by provisions in the partnership agreement."[14] There is no mention in § 17–1101(d)(2), or elsewhere in DRULPA at 6 *Del. C.,* ch. 17, that a limited partnership agreement may *eliminate* the fiduciary duties or liabilities of a general partner.

Finally, we note the historic cautionary approach of the courts of Delaware that efforts by a fiduciary to escape a fiduciary duty, whether by a corporate director or officer or other type of trustee, should be scrutinized searchingly.[15] Accordingly, although it is not appropriate for us to express an advisory opinion on a matter not before us,[16] we simply raise a note of concern and caution relating to this dubious dictum in the Vice Chancellor's summary judgment opinion.[17]

### Decision After Trial

After trial, the Court of Chancery found the defendants liable for their conduct as-sociated with the Odd Lot Resale to HGI, but upheld their conduct connected with the Reverse Split and the Option Plan.[18] The Vice Chancellor found that the Odd Lot Resale, unlike the other two transactions, did not involve an issuance of units, but rather a resale of existing units to HGI.[19] As a result, the Vice Chancellor found "inapplicable" the protections of Section 9.01 of the Partnership Agreement, which authorizes the General Partner to issue Partnership Units of any kind to any person without the consent or approval of the Limited Partners.[20] Instead, the Vice Chancellor continued, the Odd Lot Resale was subject to Partnership Agreement Sections 7.05 and 7.10(a), which provide for the contractually created fiduciary duties of entire fairness.[21]

The Vice Chancellor found that the General Partner breached the contractual fiduciary duties of entire fairness because (1)

---

**14.**　6 *Del. C.* § 17–1101(d)(2) (emphasis added).

**15.**　*See McNeil v. McNeil,* 798 A.2d 503 (Del. 2002) (discussing the fiduciary duties of trustees generally and holding that the trustees breached those duties); *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del.1993) (stating that "directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders"); *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985) ("In carrying out their managerial roles, directors are charged with an unyielding fiduciary duty to the corporation and its shareholders."); *Blum v. Kauffman,* 297 A.2d 48, 49 (Del.1972) (noting "the policy of this Court to look with disfavor upon clauses which exonerate a party from the consequences of his own negligence or that of his agent").

**16.**　See *Paramount Communications Inc. v. QVC Network, Inc.,* 637 A.2d 34, 51 (Del.1993) ("It is the nature of the judicial process that we decide only the case before us ..."); *Stroud v. Milliken Enterprises, Inc.,* 552 A.2d 476, 480 (Del.1989) ("The law is well settled that our courts will not ... render advisory opinions.") (internal quotation omitted).

**17.**　The Vice Chancellor also noted in his summary judgment opinion that "Any interstitial issues in this case are best dealt with through cautious application of the implied covenant of good faith and fair dealing." *Gotham S.J. Op.* at 29 n. 37, 2000 WL 1476663 at 12 n. 37. We note that the implied covenant of good faith and fair dealing that inheres in every contract is not pertinent to the issues in this case and any discussion in the Vice Chancellor's summary judgment about the contractual duty of good faith and fair dealing is also dictum. The issue of good faith and fair dealing is not before us, and we need not express any opinion on that issue in this case.

**18.**　*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 795 A.2d 1, 4–5 (Del.Ch.2001).

**19.**　*Id.* at 26.

**20.**　*Id.*

**21.**　*Id.*

the General Partner never formed the Audit Committee as required by Section 7.10(a) to review and approve the Odd Lot Offer and Resale, and (2) the General Partner failed to perform a market check or obtain any reliable financial analysis indicating that the Odd Lot Resale would be conducted on the same terms obtainable from a third party.[22]  The Court of Chancery thus held the General Partner liable for breach of the contractually created fiduciary duties of entire fairness contained in the Partnership Agreement and found HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for aiding and abetting its breach.[23]

Gotham requested rescission, or money damages and sterilization of voting rights.[24]  The Court of Chancery awarded money damages plus compound interest instead of rescission, in part because it found that Gotham delayed challenging the transaction "for nearly two years, and then filed suit to rescind only after it was clear that the market price [of the Partnership units] was up substantially and on a sustainable basis."[25]  The Vice Chancellor then went on to find that the challenged transactions were not "conceived of as a conscious scheme to entrench the General Partner's control and enrich HGI" improperly.  He stated that if he had been convinced otherwise, "I might be inclined to grant rescission despite Gotham's torpid pace."[26]

Gotham then filed a direct appeal in this Court contesting the remedy.  The General Partner, HGI, Gumbiner, and Guzzetti filed cross appeals asserting that the Court of Chancery erred by finding Section 9.01(a) of the Partnership Agreement inapplicable to the Odd Lot Offer and Resale or, alternatively, by holding HGI, Gumbiner, and Guzzetti liable for aiding and abetting the General Partner's breach of its contractually created fiduciary duties and by awarding compound interest on a damages award.[27]

### Issues on Appeal

On appeal, Gotham argues that the Court of Chancery was required to award rescission as a matter of law and, even if an award of monetary damages were appropriate, the Court of Chancery erred in its calculation of the damages by failing to account for a control premium.  Gotham seeks reversal in part of the judgment of the Court of Chancery and a remand to the court with instructions to order rescission of the Odd Lot Resale to HGI. Alternatively, Gotham seeks an award of rescissory damages or sterilization of HGI's voting rights connected to the Odd Lot Resale units, or both.

The General Partner, HGI, Gumbiner, and Guzzetti, contend in their cross appeal that the Court of Chancery erred: (1) by finding the Odd Lot Resale to HGI subject to Sections 7.05 and 7.10(a) of the Partnership Agreement, which provide for con-

---

**22.**  *Id.* at 26–27.

**23.**  *Id.* at 34.

**24.**  Appellant's Post–Trial Memorandum (March 21, 2001).

**25.**  *Gotham Partners,* 795 A.2d at 36–38.

**26.**  *Id.* at 36.

**27.**  The Partnership did not file briefs in this appeal but wrote a letter to this Court stating that it does not believe the Court of Chancery abused its discretion by awarding monetary damages to the Partnership instead of another form of relief and that it does not take a position on any other issue on appeal.  Letter from Elizabeth M. McGeever of Prickett, Jones & Elliott, Counsel to the Partnership, to the Clerk to the Supreme Court of Delaware (Dec. 5, 2001).

tractual fiduciary duties of entire fairness, instead of Section 9.01, which authorizes the General Partner to issue Partnership Units of any kind to any person without the consent or approval of the Limited Partners; (2) by finding HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for aiding and abetting a breach of a contractually created fiduciary duty; and (3) by awarding compound interest on money damages. We will address the cross appeals first.

### *Whether the Court of Chancery Erred By Ruling That the Odd Lot Resale to HGI Was A Resale of Partnership Units*

■ This Court reviews de novo the Court of Chancery's interpretation of written agreements [28] and Delaware law.[29]

■ As the Vice Chancellor noted at summary judgment, a general partner owes the traditional fiduciary duties of loyalty and care to the limited partnership and its partners,[30] but DRULPA § 17–1101(d)(2) "expressly authorizes the . . . modification, or enhancement of these fi-

duciary duties in the written agreement governing the limited partnership."[31] Indeed, we have recognized that, by statute, the parties to a Delaware limited partnership have the power and discretion to form and operate a limited partnership "in an environment of private ordering" according to the provisions in the limited partnership agreement.[32] We have noted that DRULPA embodies "the policy of freedom of contract"[33] and "maximum flexibility."[34] DRULPA's "basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement"[35] or "where the agreement is inconsistent with mandatory statutory provisions."[36] In those situations, a court will "look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence."[37] But, if the limited partnership agreement unambiguously provides for fiduciary duties, any claim of a breach of a fiduciary duty must be analyzed generally in terms of the

**28.** *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999).

**29.** *Rapid–American Corp. v. Harris*, 603 A.2d 796, 804 (Del.1992).

**30.** *See also Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del.Ch.1981) (stating that the general partner in a limited partnership is generally required "to exercise the utmost good faith, fairness, and loyalty") (citing *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928)), *aff'd* 483 A.2d 633 (Del.1984).

**31.** *Gotham S.J. Op.*, at 24, 2000 WL 1476663 at *10. DRULPA § 17–1101(d)(2), codified at 6 *Del. C.* § 17–1101(d)(2), reads: "To the extent that, at law or equity, a partner or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner or to anoth-

er person that is a party to or is otherwise bound by a partnership agreement, . . . (2) the partner's or other person's duties and liabilities may be expanded or restricted by provisions in the partnership agreement."

**32.** *Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 287 (Del.1999).

**33.** *Id.* at 290. *See also* Lubaroff & Altman, *supra* at n. 13 (noting that "[o]verarching principles reflected in [DRULPA]" include "the principle of freedom of contract").

**34.** *Elf Atochem*, 727 A.2d at 291 n. 27.

**35.** *Id.* at 291.

**36.** *Id.* at 292.

**37.** *Sonet*, 722 A.2d at 324.

partnership agreement.[38]

The Vice Chancellor found, and the parties do not contest, that Partnership Agreement Sections 7.05 and 7.10(a) set forth fiduciary duties of entire fairness owed by the General Partner to its partners generally in self-dealing transactions, such as the Odd Lot Resale. Section 7.05 expressly permits the Partnership to enter into self-dealing transactions with the General Partner or its affiliate "provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party."[39] Section 7.10(a) requires the General Partner to form an independent Audit Committee that shall review and approve self-dealing transactions between the Partnership and the General Partner and any of its affiliates.[40] The Vice Chancellor found, and the parties do not contest, that Sections 7.05 and 7.10(a) "operate together as a contractual statement of the traditional entire fairness standard [of fair price and fair dealing], with § 7.05 reflecting the substantive aspect of that standard and § 7.10 reflecting the procedural aspect of that standard."[41]

■ Because the Partnership Agreement provided for fiduciary duties, the Vice Chancellor properly held that the Partnership Agreement, as a contract, provides the standard for determining whether the General Partner breached its duty to the Partnership through its execution of the Odd Lot Resale. As the Vice Chancellor stated, the Partnership Agreement "leaves no room for the application of common law fiduciary duty principles to measure the General Partner's conduct"[42] because the Partnership Agreement "supplanted fiduciary duty and became the sole source of protection for the public unitholders of the Partnership."[43] Thus, "the General Partner was subject, by contract, to a fairness standard akin to the common law one applicable to self-dealing transactions by fiduciaries."[44]

**38.** *See id.* ("[U]nder Delaware limited partnership law a claim of breach of fiduciary duty must first be analyzed in terms of the operating governing instrument—the partnership agreement—and only where that document is silent or ambiguous, or where the principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence.");

**39.** Section 7.05 of the Partnership Agreement states in its entirety: "The Partnership is expressly permitted to enter into transactions with the General Partner or any Affiliate thereof provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party."

**40.** Section 7.10(a) states in its entirety: "The General Partner shall form an Audit Committee ("the Audit Committee") to be comprised of two members of the board of directors of the General Partner who are not affiliated with the General Partner or its Affiliates ex-cept by reason of such directorship. The functions of the Audit Committee shall be to review and approve (i) the expense reimbursements and compensation paid by the Partnership to the General Partner or any of its Affiliates and (ii) transactions between the Partnership and the General Partner and any of its Affiliates."

**41.** *Gotham Partners,* 795 A.2d at 26.

**42.** *Gotham S.J. Op.,* at 25, 2000 WL 1476663 at *10.

**43.** *Gotham Partners,* 795 A.2d at 24. *See also Gotham S.J. Op.,* at 28 n. 36, 2000 WL 1476663 n. 36 (noting that the court will apply "agreement provisions to the exclusion of [common law] fiduciary duty principles while recognizing that some of the agreement's provisions were 'in some sense ... an explicit acceptance of the default duty of loyalty and fair dealing ....' ") (quoting *Sonet,* 722 A.2d at 324 n. 12).

**44.** *Gotham S.J. Op.,* at 28, 2000 WL 1476663 at *12.

■ The General Partner, HGI, Gumbiner, and Guzzetti apparently concede: (1) the General Partner's conduct associated with the Odd Lot Resale did not comply with Sections 7.05 and 7.10(a) of the Partnership Agreement because, as the Vice Chancellor found; (2) the Audit Committee never reviewed or approved the Odd Lot Resale to HGI; and (3) the General Partner never obtained a reliable financial analysis indicating that the Odd Lot Resale would be conducted on the same terms obtainable from an independent third party. Nonetheless, they argue that they are not liable for failing to comply with Sections 7.05 and 7.10(a) because Section 9.01 alone governed the Odd Lot Resale. They assert that the Odd Lot Resale was an issuance rather than a resale of Partnership units to HGI. The defendants seek the protection of Section 9.01, which gives the General Partner absolute and independent authority to issue additional Partnership units to any person or entity, including affiliates such as HGI.

The Vice Chancellor properly found that the Odd Lot Resale was a resale of Partnership units to HGI and thus Section 9.01 is inapplicable. It is undisputed that the Partnership's accounting books did not treat the sale of odd lots to HGI as an issuance of units. Furthermore, the Partnership units from the Odd Lot Resale were listed on the American Stock Exchange, but the Resale was presented to the Exchange as a resale, not as an issuance. The Vice Chancellor properly found that the Odd Lot Resale was structured as a resale, in part to avoid American Stock Exchange Rule 713, which requires that holders approve additional issuances as a prerequisite to the shares or units' listing on the Exchange. Thus, the General Partner is liable for breaching the contractually created fiduciary duties of entire fairness provided by Sections 7.05 and 7.10(a) of the Partnership Agreement.

### Whether the Court of Chancery Erred by Holding HGI, Gumbiner, and Guzzetti Jointly and Severally Liable with the General Partner for Aiding and Abetting

HGI, Gumbiner, and Guzzetti argue that only the General Partner was a party to the Partnership Agreement, and therefore they cannot be held liable for breach of the Agreement. They also assert that there is no cause of action under Delaware law for aiding and abetting a breach of contract. This Court reviews de novo the Court of Chancery's interpretation of Delaware law.[45]

■ HGI, Gumbiner, and Guzzetti are correct that they cannot be held liable for breach of the Partnership Agreement because they were not parties to it. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract."[46] But, the Court of Chancery properly held HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for aiding and abetting the General Partner's breach of fiduciary duties created by the Partnership Agreement. "The elements of a claim for aiding and abetting a breach of a fiduciary duty are: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[47]

**45.** *Rapid–American Corp.*, 603 A.2d at 804.

**46.** *Wallace v. Wood*, 752 A.2d 1175, 1180 (Del.Ch.1999) (citation omitted).

**47.** *Fitzgerald v. Cantor*, 1999 WL 182573 (Del. Ch.), at *1.

In this case, the General Partner had a fiduciary relationship with the Partnership and its limited partners as defined by the Partnership Agreement. The General Partner breached Sections 7.05 and 7.10(a), which impose the fiduciary duties of entire fairness. HGI, Gumbiner, and Guzzetti knowingly participated in the breach of fiduciary duties, and the limited partners consequently were injured. The Vice Chancellor correctly noted that "where a corporate General Partner fails to comply with a contractual standard [of fiduciary duty] that supplants traditional fiduciary duties and the General Partner's failure is caused by its directors and controlling stockholder, the directors and controlling stockholders remain liable." [48] The Court of Chancery thus properly held HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for the General Partner's breach of the Partnership Agreement's fiduciary duties of entire fairness.

### Whether the Court of Chancery Erred by Awarding Compound Interest on a Damages Award

■ The Court of Chancery awarded damages including "pre-judgment interest at the statutory amount, compounded monthly from August 1, 1995 until the date of judgment." [49] The defendants assert that the Court of Chancery may not award compound interest as a matter of law. This Court reviews de novo the Court of

Chancery's interpretation of Delaware law. [50]

Delaware courts have traditionally disfavored compound interest. [51] But, we agree with the Court of Chancery that its uncontested "discretion to select a rate of interest higher than the statutory rate ... include[es] the lesser authority to award compounding." [52] The Court of Chancery has noted that, in Delaware, "no rule of simple interest exists in the General Corporation Law" and "[t]he rule or practice of awarding simple interest, in this day and age, has nothing to commend it— except that it has always been done that way in the past." [53] We agree, and even before this appeal, we recognized the discretion of the Court of Chancery to award compound interest. [54] Thus, we find that the Vice Chancellor had the discretion to award compound interest in this case and did not abuse that discretion.

### Whether the Court of Chancery Had Discretion Not to Grant Rescission in This Case

■ Gotham makes three arguments to support its claim that the Court of Chancery erred by refusing to order rescission of the Odd Lot Resale: (1) rescission is required by law; (2) rescission is appropriate because the Odd Lot Resale was the result of a breach of a contractually created fiduciary duty or the aiding and abetting of that breach; and (3) rescission is appropriate because, without it, the de-

**48.** *Gotham Partners,* 795 A.2d at 34.

**49.** *Id.* at 38.

**50.** *Rapid–American Corp.,* 603 A.2d at 804.

**51.** *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 410 (Del.1988) (noting that "Delaware courts have traditionally disfavored the practice of compounding interest").

**52.** *Brandin v. Gottlieb,* 2000 WL 1005954 (Del.Ch.), at *29 n. 83.

**53.** *Onti, Inc. v. Integra Bank,* 751 A.2d 904, 929 (Del.Ch.1999).

**54.** *See, e.g., Smith v. Nu–West Indus.,* 2001 WL 50206 (Del.Ch.), at *1 (granting an award of prejudgment interest at ten percent compounded monthly), *aff'd,* 781 A.2d 695 (Del. 2001).

fendants will retain their ill-gotten advantage of control over the Partnership and will be unjustly enriched by their breach of the Partnership Agreement.

■ Gotham's first contention is incorrect. Rescission "is not given for every serious mistake and it is neither given nor withheld automatically, but is awarded as a matter of judgment." [55]

Gotham's second and third arguments might be persuasive but for the fact that the Court of Chancery found that: (1) Gotham delayed bringing suit for an injunction or rescission until it "tested the waters" and the Partnership's publicly listed units rose in value; and (2) the Odd Lot Resale was not "a conscious scheme to entrench the General Partner's control and enrich HGI through sales of Partnership units on the cheap in deals effected without procedural safeguards or full disclosure." [56] We cannot conclude on this record that these findings of fact are clearly erroneous.

■ The Court of Chancery has noted: "It is a well-established principle of equity that a plaintiff waives the right to rescission by excessive delay in seeking it." [57] Furthermore, "[i]t is not a matter of laches and there is no requirement that the defendant show prejudice from the delay. [Rather, i]t is the plaintiff's burden to prove promptness, not the defendant's to prove delay." [58] The Court of Chancery thus has the discretion not to grant rescission where delay allows the plaintiff "to sit

back and 'test the waters,' waiting to assert a claim for rescission until after [the] stock price ha[s] increased." [59] Gotham never sought an injunction despite its knowledge as early as June 5, 1995 that the Odd Lot Offer units would be resold to HGI. Rather, Gotham waited until nearly two years had passed before seeking rescission. Gotham attempts to persuade this Court that any delay on its side was the result of Gotham complying with this Court's instruction that prospective plaintiffs request access to books and records before filing suit.[60] But Gotham did not request access to the Partnership's books and records until almost a year and a half after the Odd Lot Resale.

The Vice Chancellor thus properly found that Gotham failed to meet its burden to prove promptness because it substantially and unjustifiably delayed seeking rescission. As the Vice Chancellor stated, Gotham's delay enabled it "to see what the market price for Partnership units would do, and to sue only if the Odd Lot Offer resales turned out to be favorable to HGI." [61] Indeed, "Gotham sat back and let HGI take the risk of its purchases for nearly two years, and then filed suit to rescind only after it was clear that the market was up substantially on a sustainable basis." [62]

The Vice Chancellor properly did not view Gotham's delay alone as the determinative factor. As he noted, rescission nonetheless might be a possible remedy if

---

**55.** *Gaffin v. Teledyne, Inc.,* 1990 WL 195914 (Del.Ch.), at *16, *aff'd in part and rev'd in part on other grounds,* 611 A.2d 467 (Del.1992).

**56.** *Gotham Partners,* 795 A.2d at 36.

**57.** *Gaffin,* 1990 WL 195914, at *18.

**58.** *Id.*

**59.** *Gaffin,* 1990 WL 195914, at *17.

**60.** *See, e.g., White v. Panic,* 783 A.2d 543, 549 n. 15 (Del.2001) (urging prospective plaintiffs to use the "tools at hand," such as books and records requests, to obtain information to support their claims and to avoid dismissal for failure to state a claim).

**61.** *Gotham Partners,* 795 A.2d at 36.

**62.** *Id.*

the Odd Lot Resale had been "a conscious scheme to entrench the General Partner's control and enrich HGI through sales of Partnership units on the cheap in deals effected without procedural safeguards or full disclosure." [63] Because Gotham unjustifiably delayed challenging the Odd Lot Resale and the defendants did not intend to entrench the General Partner or improperly enrich HGI, we find that the Vice Chancellor was within his discretion in refusing to grant rescission in this case, even though the result of the challenged transaction was to secure control by the defendants. Given the result of control and the defendants' conduct, however, an adequate, rationally-articulated substitute remedy must be awarded.

### Whether the Court of Chancery Abused Its Discretion by Failing to Account for a Control Premium

■■■ The Court of Chancery awarded money damages of approximately $3.4 million based on a per unit value of $25.84 for each Partnership unit resold to HGI.[64] The court gave equal weight to four factors: book value, Gotham's comparables for minority stakes in other limited partnerships, the per unit price of an unrelated Spring 1996 repurchase of Partnership units, and the average price paid by the Partnership during the Odd Lot Offer.[65] Gotham notes that none of the four factors "takes account of the lock on control that HGI obtained in the Resale."[66] Gotham emphasizes that, at trial, Gumbiner valued

control of the Partnership at $50 to $55 million and that only a mere $3.4 million was awarded as monetary damages. Gotham argues that this Court should reverse on this issue and remand to the Court of Chancery for a new remedy calculation that accounts for the value of control of the Partnership. This Court reviews the Court of Chancery's fashioning of remedies for abuse of discretion.[67]

■■■■ The Partnership Agreement provides for contractual fiduciary duties of entire fairness. Although the contract could have limited the damage remedy for breach of these duties to contract damages, it did not do so. The Court of Chancery is not precluded from awarding equitable relief as provided by the entire fairness standard where, as here, the general partner breached its contractually created fiduciary duty to meet the entire fairness standard and the partnership agreement is silent regarding damages. The Court of Chancery in this case may award equitable relief as provided by the entire fairness standard and is not limited to contract damages for two reasons: (1) this case involves a breach of the duty of loyalty and such a breach permits broad, discretionary, and equitable remedies; and (2) courts will not construe a contract as taking away other forms of appropriate relief, including equitable relief, unless the contract explicitly provides for an exclusive remedy.

---

**63.** *Id.* (noting "in particular the evidence that indicates the reluctance of HGI to fund the Odd Lot Offer"). *See also id.* at 13 (stating that HGI first declined to provide funding for the Reverse Split and Odd Lot Offer).

**64.** *Id.* at 38.

**65.** *Id.*

**66.** Appellant's Op. Brief at 39.

**67.** *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del.1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 439 (Del.2000) (noting that this Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy").

■ In this case, as the Vice Chancellor properly found, the fiduciary duties provided for by the Partnership Agreement supplanted common law fiduciary duty principles,[68] but "some of the agreement's provisions were 'in some sense . . . an explicit acceptance of the default duty of loyalty and fair dealing.' "[69] The General Partner breached its duty of loyalty by failing to comply with the contractually created entire fairness standard during the Odd Lot Resale, which resulted in the General Partner and its corporate parent solidifying their control over the Partnership. Where there is "a breach of the duty of loyalty, as here, 'potentially harsher rules come into play' and 'the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly [because t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty.' "[70] Therefore, the Court of Chancery's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate."[71]

■ In addition, courts will not construe a contract "as taking away a common law remedy unless that result is imperatively required."[72] For example, this Court has held that, even if a contract specifies a remedy for breach of that contract, "a contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity."[73] The Maryland Court of Appeals also has held that "mere inclusion" of a money damages clause as the specified remedy for a breach will not "negate the possibility of injunctive [or other equitable or legal] relief in a proper case."[74] Therefore, even where a partnership agreement specifies a remedy for breach of that contract, the Court of Chancery is not prohibited from awarding other equitable or legal remedies, at least unless the partnership agreement explicitly states that the specified remedy is the exclusive remedy. In addition, where the partnership agreement is silent regarding remedies, the Court of Chancery has the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement. The Vice Chancellor thus had the discretion to apply any equitable and/or legal remedy applicable in corporate cases where the controlling entity fails the test of entire fairness.[75]

68. *Gotham S.J. Op.*, at 23–29, 2000 WL 1476663 at *10–*12.

69. *Id.* at 28 n. 36, 2000 WL 1476663 at *11 n. 36 (quoting *Sonet*, 722 A.2d at 324 n. 12).

70. *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911 (Del.Ch.), at *3 (quoting *Int'l Telecharge*, 766 A.2d at 441 (quoting *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996))).

71. *Weinberger*, 457 A.2d at 714. *See also Int'l Telecharge*, 766 A.2d at 440 (stating that "the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate"); *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370 (Del.Ch.), at *29–*30 (stating that "equity must try to right the wrongs with adequate remedies" and awarding a declaratory judgment and money damages for a breach of a contractually created fiduciary duty).

72. 17A Am.Jur.2d Contracts § 727 (1991) (quoted in *Massachusetts Indem. & Life Ins. Co. v. Dresser*, 269 Md. 364, 306 A.2d 213, 217 (1973); *Local 248 UAW v. Natzke*, 36 Wis.2d 237, 153 N.W.2d 602, 609 (1967)).

73. *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 214 (Del.1975) (reviewing an action brought to recover damages from the deterioration of chemical process tank linings applied by a subcontractor).

74. *Dresser*, 306 A.2d at 217 (interpreting an employment contract's damages provision for breach of a covenant not to compete).

75. *Weinberger*, 457 A.2d at 714 (stating that if a transaction does not meet the entire fairness

The question is whether he abused that discretion by not ordering adequate damages or equitable remedies to account for the control premium.

In this case, Gotham requested rescission, or rescissory damages and sterilization of the voting rights attached to the Odd Lot Resale units. The Vice Chancellor, as discussed above, had the discretion not to grant rescission because Gotham unjustifiably delayed contesting the Odd Lot Resale and the defendants did not intend to entrench the General Partner or unfairly enrich HGI through the challenged transaction. Although the Vice Chancellor found that the defendants did not intend for the General Partner to become entrenched or HGI to be unjustly enriched, the Odd Lot Resale had that effect. The Court of Chancery was thus required to remedy that effect by compensating the limited partners for a control premium. As the Vice Chancellor recognized, the Audit Committee—whose contractually-mandated functions were not implemented—conceivably would have "taken into account the fact that the Odd Lot resales were of particular advantage to HGI and demanded value for that advantage in exchange" because "the Odd Lot resales solidified HGI's control." [76] Consequently, we find that the Vice Chancellor abused his discretion in fashioning the remedy in this case by failing (1) to address and decide the applicability of rescissory damages, and (2) to include in the damages calculation a premium for the control acquired by HGI through the Odd Lot Resale.

The Partnership is entitled to receive, at a minimum, what the Partnership units sold to HGI would have been worth at the time of the Odd Lot Resale if the General Partner had complied with the Partnership Agreement. [77] We thus reverse the judgment of the Court of Chancery regarding the remedy in this case, and we remand for procedures, such as expansion of the record, as may be necessary and appropriate to accomplish two objectives. First, the Court of Chancery should seek to quantify how the challenged transaction would have been consummated had the defendants adhered to the Partnership Agreement's contractual entire fairness provisions. Specifically, the court should determine and consider what price the Audit Committee would have approved for the Odd Lot Offer resales to HGI if the Audit Committee had been aware that the transaction would result in HGI solidifying control over the Partnership. Second, the Court of Chancery should reconsider and

standard, the Court of Chancery's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate"); *Int'l Telecharge*, 766 A.2d at 442 (rejecting the argument that a finding of a breach of the duty of loyalty requires disgorgement); *Gaffin*, 1990 WL 195914, at *17 (holding that "a plaintiff waives the right to rescission by excessive delay" and must prove promptness), *aff'd in part and rev'd in part on other grounds*, 611 A.2d 467 (Del.1992); *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 699 (Del.Ch.1996) ("[T]he Court will exercise its discretion to craft from the 'panoply of equitable remedies' a damage award that approximates a price the board would have approved absent a breach of duty."); *Thorpe*, 676 A.2d at 445 (remanding for determination of damages in-

cidental to a breach of duty so that the fiduciary will would "not profit personally from his conduct, an that the beneficiary [would] not be bound by such conduct").

76. *Gotham Partners*, 795 A.2d at 37.

77. *Int'l Telecharge*, 766 A.2d at 441 (finding no abuse of discretion where the Court of Chancery concluded that plaintiffs were entitled to receive, "at a minimum, what their shares would have been worth at the time of the Merger if [the chief executive officer and controlling stockholder] had not breached his fiduciary duties") (internal quotation omitted).

award some form or combination of the various equitable remedies available to the limited partnership, including rescissory damages, sterilization of voting rights, and other appropriate methods of accounting for a control premium. We note that the Court of Chancery has the discretion to consider afresh in light of the above analysis whether or not to order rescission.

### Conclusion

We affirm the judgment of the Court of Chancery that (1) the contractual fiduciary duties of entire fairness contained in the Partnership Agreement applied to the disputed transaction in this case; (2) defendants HGI, Gumbiner, and Guzzetti are jointly and severally liable with the General Partner because they aided and abetted the General Partner's breach of the contractually created fiduciary duties of entire fairness; (3) the Court of Chancery has the discretion not to grant rescission where the plaintiff unjustifiably delays seeking that remedy, provided that the court articulates and orders a reasonable alternative remedy; and (4) the court has discretion to award compound interest on the resulting damage remedy.

We reverse the judgment of the Court of Chancery regarding the calculation of damages. We remand, as discussed above, for the court to fashion a remedy according to its discretion that accounts for a control premium.

Jurisdiction is not retained.